| iPETERS, Judge.
The defendant, Sidney Bradley Anderson, was charged by grand jury indictment with second degree murder, a violation of La.R.S. 14:30.1. After a bench trial, he was found guilty as a principal to second degree murder pursuant to La.R.S. 14:24. The trial court sentenced the defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. After the defendant’s motion for new trial was denied, he appealed.
DISCUSSION OF THE RECORD
While most of the evidence on the question of the defendant’s guilt or innocence is in conflict, there are certain facts that are not in dispute. On the evening of November 20, 1993, the defendant and John Alan Palfrey appeared at 116)é Royal Street in Lafayette, Louisiana. Their purpose was to visit with Fredrika Flynn Stevens, the seventeen-year-old daughter of Barbara Stevens. It appears from the | ¿record that Barbara Stevens; her daughter; and her teenage niece, Sylvia Marie Stevens, resided at the Royal Street location. When the defendant and Palfrey went to the residence, each was carrying a weapon. Palfrey was armed with a blue steel .25-caliber semiautomatic pistol, and the defendant was armed with a chrome-plated pistol.[1] *337 After the men arrived, an altercation ensued between the defendant and Joseph Elroy Carter which resulted in Carter being shot in the right scapula area by someone with a .25-caliber pistol.[2] Carter died as a result of his wound.
Barbara Stevens obviously did not want the company of the defendant and Palfrey. She called her friend, Charles R. Joubert, Jr., on his mobile telephone and requested that he come to her residence to make the two men leave. When Joubert received the call, he and Carter were in his vehicle, returning home from a liquor store where they had just made a purchase. Joubert and Carter then went to the Stevens residence where they encountered the defendant and Palfrey as well as four or five other people.
Joubert testified that he instructed the two men to leave, and it is at this point that the evidence becomes conflicting. The only facts not in dispute after this point are that the defendant and Carter became involved in a fistic encounter outside of the residence, that sometime during the altercation Carter was shot, and that Carter died as a result of his wound.
The state presented the testimony of the following eyewitnesses: Palfrey; Joubert; Frederick Ray Burke, the brother-in-law of Barbara Stevens; Carroll Kenneth RLindon, the boyfriend of Sylvia Stevens; Sylvia Stevens; and Fredrika Stevens. Palfrey testified that when the defendant, Carter, and he exited the residence and moved to the sidewalk, an argument ensued between the defendant and Carter. According to Palfrey, the defendant gave him the chrome-plated pistol before any blows were passed between the two men. At some point during the fistic encounter, the two men separated and the defendant approached Palfrey, who testified that he then handed the defendant the chrome-plated pistol. Palfrey testified that the fight began anew and that as the two men struggled on the ground, he heard two shots. He stated that Carter then got up from the ground and ran and that the defendant left. When asked specifically who shot Carter, Palfrey stated that he could not say. He did say that at some point during the altercation, the defendant apparently shot himself. When asked whether he had shot Carter, Palfrey testified that he had not and that his .25-ealiber pistol never left his possession.
The other eyewitnesses confirmed Palfrey’s version in most respects. All of them testified that after the physical altercation began, they saw Palfrey hand the defendant a gun and that they then heard shots. Additionally, the weapon was described by every eyewitness as a chrome- or silver-plated weapon. Their testimony varied as to the number of shots that were fired, the caliber of the chrome-plated pistol, how many times Carter was struck, and whether the defendant pursued Carter after he ran away — but all that were asked testified that Palfrey did not fire his pistol. Fredrika Stevens testified that she saw the defendant fire his weapon and saw the bullet strike Carter in the chest.[3]
UDetective Kristen Bayard of the Lafayette City Police Department was the first officer on the scene. She arrived about 8:30 p.m. and secured the crime scene. Carter’s body was lying on the sidewalk at the corner of Royal and Delord Streets. In her initial investigation, she observed three spent casings on the road and marked their location for the other investigative officers.
Detective Kip Anthony Judice of the Lafayette Parish Sheriffs Office arrived on the scene at 9:33 p.m. and collected the three casings. According to Detective Judice, two of the casings appeared to be from a .380-caliber weapon and one from a .25-caliber weapon. He testified that the two .380 casings appeared sun bleached and were cov *338 ered with dust and debris. Additionally, one of them was dented. From these observations, he concluded that these casings were not involved in the crime being investigated. The .25-caliber casing appeared to Detective Judice to have only recently been deposited on the scene and therefore was more consistent with the time frame of the crime being investigated. He collected all three casings and forwarded them to the Acadiana Crimi-nalistics Laboratory for testing.
On the evening of the incident, Captain Knowles Jones of the Lafayette City Police Department was dispatched to the hospital where Carter had been transported. He relayed to officers at the scene that Carter was dead. A warrant was then issued for the arrest of the defendant on the charge of second degree murder. Sometime thereafter, the defendant turned himself in to Officer Brad Ridge of the Lafayette City Police Department. Officer Ridge observed that the defendant was suffering from a gunshot wound to the left thigh and was complaining that he had a sore hand and had been struck in the head. An ambulance was called to transport the defendant for medical care, and Officer Ridge overheard the defendant tell the Acadian Ambulance ^attendants that a .380-caliber bullet had gone through his leg. Officer Ridge did not question him concerning this statement because the defendant had already been read his rights and had requested an attorney. Apparently, the bullet had entered the defendant’s left inner thigh and exited through his left outer thigh.
A casual observation of the evidence described would seem to indicate an uncomplicated, open-and-shut investigation. This was not the case. An autopsy was performed on Carter and revealed that the cause of death was the previously described bullet wound. However, the bullet did not exit Carter’s body and was recovered during the autopsy and given to Officer Judice, who was in attendance at the autopsy. Officer Judice then forwarded the bullet to the Acadiana Crimi-nalistics Laboratory, where it was tested and was determined to be a .25-caliber projectile.
As the investigation into this matter unfolded, Detective Shannon Hundley of the Lafayette City Police Department Crimes Against Persons Unit became aware of an ongoing investigation into a homicide that had occurred approximately twenty-four hours before Carter’s death. The victim in that homicide had been killed by two bullets from a .25-caliber weapon, and Palfrey was a suspect in that crime. As a result of that investigation, a .25-caliber semiautomatic pistol and a .380-caliber semiautomatic pistol were recovered from the home of Palfrey’s sister and submitted to the Acadiana Crimi-nalistics Laboratory for testing. Both of these weapons were constructed of blue steel — not chrome. At the defendant’s trial, Palfrey identified the .25-caliber weapon recovered from his sister’s home as the one he had in his possession on the night of Carter’s death. He identified the .380-caliber weapon as belonging to his cousin.
Not only did this testing reveal that the two bullets that killed the other victim ftcame from the .25-caliber weapon, but it also revealed that the bullet that was recovered from Carter’s body was fired from the same weapon. Palfrey confessed to the other homicide, and by the time the defendant was tried, Palfrey had pled guilty to manslaughter in that matter and had been sentenced to serve thirty-five years at hard labor. Additionally, he had pled guilty to accessory after the fact to manslaughter for his involvement in Carter’s death and had been sentenced to serve five years at hard labor, the sentence to run concurrently with the thirty-five-year sentence.
The original grand jury indictment charged that the defendant and Palfrey “did commit second degree murder of one JOSEPH ELROY CARTER, in violation of the provisions of R.S. 14:30.1-” Additionally, in answer to the defendant’s motion for a bill of particulars, the state responded that the prosecution was being pursued under La.R.S. 14:30.1(A)(1) and (B). No mention was made in the record prior to trial that the actual killer of Carter was anyone other than the defendant.
By the time the defendant was tried, the state was faced with a situation in which all of its eyewitness testimony was to the effect that Carter was shot by the defendant with a chrome-plated pistol. However, the undis *339 puted scientific evidence established that Carter was shot by a .25-caliber weapon belonging to Palfrey, which Palfrey said never left his pocket during the altercation. The state chose to take the position that the defendant was guilty of second degree murder as a principal to the shooting by Palfrey.
On appeal, the defendant raised six assignments of error. Because we find merit in the third assignment of error, we do not find it necessary to address the remaining assignments, and we reverse the conviction and sentence.
JtOPINION
In his third assignment of error, the defendant contends that the evidence was not sufficient to convince a rational trier of fact that all of the elements of the crime had been proven beyond a reasonable doubt and that the trial court erred in finding him guilty as a principal to second degree murder. We agree.
In his opening statement, the assistant district attorney made the following statement concerning what the state intended to prove:
I will tell the Court at this moment that Sidney Anderson in one sense did not kill Joseph Elroy Carter. He did not fire the gun. The evidence will not show that he fired the gun that killed Joseph Elroy Carter. The slug that was removed from Joseph Elroy Carter came from a gun that the defendant did not fire.
He went on to say in the opening statement that Palfrey fired the fatal shot. Thus, the state limited its own ease to proving that the defendant was guilty as only a principal to second degree murder.
In order to establish the defendant’s guilt, the state was required to prove the elements of the crime beyond a reasonable doubt. Second degree murder is defined as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1(A)(1). A principal to a crime is defined in La.R.S. 14:24 as follows:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Only those persons who knowingly participate in the planning or execution of a crime are principals to the crime. State v. Pierre, 93-0893 (La.2/3/94); 631 So.2d 427. Mere presence at the scene of the crime is not enough to concern an individual in the crime. Id.
| gin this case, because the state conceded that Palfrey killed Carter, it had to prove beyond a reasonable doubt that the defendant aided, abetted, counseled, or procured Palfrey in the commission of the offense. When the issue of the sufficiency of the evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable' doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). It is the fact finder’s role to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. Graffagnino, 436 So.2d 559.
The state argues that the defendant did everything he could to effect the death of Carter. While the evidence might support a finding that the defendant had a specific intent to Mil Carter and that he was unsuccessful only because he missed, the defendant was not charged with attempted second degree murder, nor was he charged with any other crime of violence addressed against the person of the victim. Additionally, the evidence does not show that the defendant aided, abetted, counseled, or procured Palfrey to commit the crime of second degree murder. The fact that Palfrey fired the fatal shot is not enough to establish the defendant’s guilt since the evidence does not show that the defendant knowingly participated in *340 the planning or execution of Palfrey’s crime. There is simply no evidence to support that the defendant aided, abetted, counseled, or procured Palfrey to commit the crime. See State v. Dozier, 553 So.2d 911 (La.App. 4 Cir.1989), writ denied, 558 So.2d 568 (La.1990).
DISPOSITION
In the instant ease, we find that the evidence was insufficient to support a conviction of principal to second degree murder. Thus, we reverse the defendant’s conviction and sentence.
REVERSED.

. Most of the evidence is to the effect that this weapon was a .380-caliber pistol. However, *337 some of the eyewitnesses described it as a .25-caliber pistol. The weapon was never recovered.

. The death certificate lists the victim’s name as Joseph Leroy Carter, Jr. However, in the transcript, the victim’s name is stated as Joseph Elroy Carter. For purposes of this opinion, we will refer to the victim as Joseph Elroy Carter.

. She also testified that she saw the defendant shoot Carter in the leg and the face as well as the chest. However, the evidence showed that the only gunshot injury to Carter was a wound to the right scapula area.